


U.S. Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution

---

P.O. Box 1731
Waseca, MN  56093-0741

March 28, 2005

The Honorable Michael M. Mihm
United States District Judge
Central District of Illinois
204 Federal Building
100 Northeast Monroe Street
Peoria, Illinois 61602

RE:   **McGhee, Revere Lamar**
      **Reg. No. 13267-026**
      **Docket No. 04-40006**

Dear District Judge Mihm:

Your Order of February 22, 2005, committed Mr. Revere Lamar McGhee to the custody of the United States Attorney General for evaluation pursuant to Title 18, United States Code, Sections 4241 and 4242.

Mr. McGhee arrived at the Federal Correctional Institution Waseca, Minnesota, on March 21, 2005, to begin his evaluation. Pursuant to our conversation with the Court, and in accordance with statute, it is anticipated we will require the full 45 days in order to provide a comprehensive report. Accordingly, the evaluation period will be completed on May 4, 2005, and Mr. McGhee will be ready to return to your Court at that time. We are committed to providing a comprehensive, quality report to the Court, and will do so as soon as reasonably possible after the study period is complete.

If you have any questions or concerns regarding this evaluation, please do not hesitate to contact the assigned Case Manager, Ms. Susan Syverson, at (507) 835-8972, extension 4615.

Sincerely,

*R. A*

Carol Holinka
Warden

cc:   Sara L. Darrow, Assistant United States Attorney
      Jack A. Schwartz, Defense Attorney
      Rich Carroll, Chief United States Probation Officer

Sara L. Darrow, AUSA
United States Attorneys Office
Central District of Illinois
1830 Second Avenue
Rock Island, Illinois 61201-8003


Jack A. Schwartz, Defense Attorney
1800 Third Avenue
Suite 221
Rock Island, Illinois 61201


Rich Carroll, Chief
United States Probation Office
Central District of Illinois
127 United States Courthouse
201 South Vine Street
Urbana, Illinois 61801

United States Department of Justice
Federal Bureau of Prisons
Federal Correctional Institution
Waseca, Minnesota 56093

FORENSIC EVALUATION

**NAME:** McGHEE, REVERE LAMAR                **REGISTER NUMBER:** 13267-026

**CASE NUMBER:** 04-40006

**DATE OF BIRTH:** 06-03-1977

**DATES OF EVALUATION:** 03-21-2005 through 05-04-2005

**DATE OF REPORT:** 05-23-2005

**IDENTIFICATION INFORMATION:** Revere McGhee is a 27-year-old, African American male committed to the Federal Correctional Institution (FCI), Waseca, Minnesota, under the provisions of Title 18, United States Code, Section 4241(b) and 4242. In a Court Order dated February 22, 2005, the Honorable Michael M. Mihm, United States District Judge for the Central District of Illinois, requested an evaluation of Mr. McGhee for present competency to stand trial and mental state at the time of the alleged offense. Specifically, the Order requests an opinion on whether the defendant is suffering from a mental disease or defect rendering him mentally incompetent to the extent he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense. In addition, the Order requests an opinion on whether at the time of the commission of the alleged acts, the defendant, as a result of a severe mental disease or defect was unable to appreciate the nature and quality or wrongfulness of his acts. The referral question is posed in regard to the defendant's criminal charge of Distribution of Crack Cocaine.

**ASSESSMENT PROCEDURES:** Prior to commencing the evaluation, Mr. McGhee was fully informed of its nature and purpose. He was informed any information he provided was not confidential but subject to inclusion in the evaluation report, which would be made available to the Court and to the prosecuting and defense attorneys. He was further informed staff from FCI Waseca could be subpoenaed at a later date to testify regarding his mental status. Mr. McGhee was encouraged to participate in the evaluation process but was informed he had the right to refuse to discuss any topic areas. He demonstrated no difficulty in understanding the limits of confidentiality, and he discussed all topics without defensiveness.

The evaluation consisted of a review of available records, a physical examination by Health Services staff, and clinical interviews with the defendant. Phone and electronic messages were left for Jack Schwartz, defense counsel, and Sara L. Darrow, Assistant United States Attorney (AUSA). Psychological testing was utilized, including the Minnesota Multiphasic Personality Inventory - Second Edition (MMPI-2), the Structured Interview of Reported

Symptoms (SIRS), the Wechsler Abbreviated Scale of Intelligence (WASI), the Millon Clinical Multiaxial Inventory - Third Edition (MCMI-III), and the revised Competency Assessment Instrument (CAI). In addition, Mr. McGhee's telephone calls between March 26, 2005, through May 6, 2005, were reviewed. Various legal and medical documents were reviewed with an emphasis on the following documents and materials:

1. Indictment, United States District Court, Central District of Illinois, Rock Island, undated;
2. Cooperation Plea Agreement and Stipulation of Facts, United States District Court, Central District of Illinois, Rock Island, undated;
3. Docket sheet, United States District Court, Central District of Illinois, Rock Island, reflecting entries from January 21, 2004, to February 22, 2005;
4. Transcript of Testimony of Mark E. Digney, United States District Court, Central District of Illinois, Rock Island, dated January 21, 2004;
5. Investigative records, Federal Bureau of Investigation (FBI), dated November 6, 2000, to October 20, 2003;
6. Order for Psychiatric or Psychological Examination, United States District Court, Central District of Illinois, Rock Island, dated February 22, 2005;
7. Presentence Investigation Report, United States District Court, Central District of Illinois, Rock Island, dated January 21, 2005;
8. Medical records, Mercer County Jail, dated June 30, 2004, to February 28, 2005;
9. Medical records, North Central Correctional Facility, dated June 29, 1997;
10. Medical records, Trinity Medical Center, dated January 30, 2004;
11. Medical records, Robert Young Center for Community Mental Health, dated February 25, 2002, to June 24, 2004;
12. Medical records, Robert Young Riverside Chemical Dependency Center, dated March 1, 2002, to April 1, 2002.

**BACKGROUND INFORMATION:**
The following information regarding Mr. McGhee's history is based on his self-report and the above referenced resources. Overall, the defendant provided a chronological and rational account of his personal history and the alleged offense. However, he was often vague in discussing his mental health symptoms and psychological testing indicates he was actively malingering or exaggerating his mental health history. As such, he is viewed as a marginal historian.

**Developmental History:** Mr. McGhee was born on June 3, 1977, in Rock Island, Illinois. He was the first of two children born to the marital union of his biological parents. He was unaware of any physical, emotional, or developmental problems which occurred during his infancy or early childhood. To his knowledge he reached all developmental milestones (i.e., walking, talking) within normal limits. Mr. McGhee's parents divorced when he was eight-years-old and he has five paternal half-siblings and one maternal half-sibling. He denied any

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 2**

significant relationship with any of these siblings except the latter. Although the defendant's father was absent for much of his childhood and adolescence, Mr. McGhee reported his home life was unremarkable. He denied any physical, sexual, or emotional abuse. When asked about his adolescence, he suggested he frequently experienced problems related to his poor school attendance, drug use, and difficulty following the rules.

Mr. McGhee has resided in Rock Island or Moline, Illinois, for most of his life with one exception. In 1999, he resided with his father in Springfield, Illinois, for approximately four months.

**Educational History:** Mr. McGhee reported he started school with his same-age peers and to his knowledge, he did not experience any grade-retentions or participate in special education. In junior high, he began skipping school and received failing grades. He quit school in tenth grade but went on to earn his General Educational Development (GED) diploma while in custody of the Iowa Department of Corrections (DOC).

**Employment History:** While the defendant has held jobs in several general labor positions, his tenure was generally short-lived. He often quit because he became bored or was fired after only a few months due to his difficulty in working with authority figures. While he worked as a janitor for his father's company between 2000 and 2004, again his periods of work were intermittent.

**Military History:** The defendant denied any military history.

**Marital History:** The defendant was married in May 2002. His wife had four children from a previous relationship but they do not have any children together. Although he and his wife separated in May 2004, they continue to maintain contact and plan to remain married upon release from custody. Mr. McGhee has four biological children with three other women. He reported he maintains contact with all of his children though records indicate he is named in four civil suits regarding unpaid child support payments.

**Medical History:** Mr. McGhee denied any significant injuries, surgeries, hospitalizations, or chronic illnesses.

**Psychiatric History:** Prior to his incarceration when he was 18 or 19 years of age, he denied any mental health problems. However, during that incarceration, he stated he began to hear voices telling him to harm himself. He stated he has heard the voices continuously since that time. However, in the records received from the North Central Correctional Facility, there is no evidence the defendant reported, received treatment for, or was diagnosed with any psychiatric disorder or observed to display any significant mental health symptoms. Further, although he has participated in several substance abuse treatment programs, he denied ever being diagnosed or treated for these reported hallucinations until

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 3**

his incarceration for the current charges in January 2005. Specifically, while housed in the Mercer County Jail, he was referred, as an outpatient, to Trinity Mental Health Center for anxiety and hallucinations. In a progress note dated January 18, 2005, the defendant's mental status was described as follows:

> His mental status examination is significant for difficulty in participating in the interview because of auditory hallucinations. At times he will tap his forehead to maintain contact. One can see him become distracted by internal stimuli. On numerous occasions, he turned his head away, paused for a long period of time, sometimes eventually answered a questions (sic), sometimes never doing that. He became acutely anxious and wanted the door open of the interview room. At another point, he spoke softly. His eye contact was variable. His affect of integration was poor. He related in an intense, cautious fashion with slight hesitation.

He was diagnosed with Bipolar Disorder, Manic Type, with Psychotic Features; Alcohol and Marijuana Dependency in Early Remission; and Avoidant Personality Type. He was treated with Prozac (antidepressant) and risperidone (antipsychotic) and returned to the jail.

When he was seen two weeks later on February 1, 2005, he was observed to pay attention in the interview, though he still demonstrated some delays. He continued to complain he was experiencing auditory hallucinations which stated things like "he is going to go down, like he is going to die, like something bad is going to happen to him." He said this occurred "twice a day." During that interview, he also stated he was unhappy with his attorney. Specifically, Mr. McGhee stated he did not have an extensive discussion with his attorney about the ramifications of his plea and he thought maybe he should have just gone to trial. At this point, Mr. McGhee was due to go to sentencing in about 10 or 11 days. At this time, his physician sent a note to the judge indicating Mr. McGhee was psychotic. Also, his risperidone was increased and his Prozac was discontinued.

**Substance Abuse History:** Mr. McGhee stated he first smoked marijuana at approximately age five and by age 16 he was smoking and drinking alcohol daily. Records suggest he first participated in substance abuse treatment at the Center for Alcohol and Drug Services (CADS) in 1996. Although information was requested from this agency, none was received. After being convicted of Driving Under the Influence, he was evaluated for substance abuse at Riverside in Rock Island. As a result of this evaluation, he was placed in an Intensive Outpatient Program (IOP) for substance abuse treatment. After one month of lack of attendance, he was discharged as unsuccessful. In April 2002, the defendant was again evaluated by CADS. He was diagnosed with Alcohol and Cannabis Dependence. While he was again recommended to complete substance abuse treatment at Riverside, he failed to show up. Later in 2002, from October through December, the defendant was enrolled in the IOP, but again, he was discharged as unsuccessful due to poor attendance.

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 4**

In relation to the current charges, Mr. McGhee was evaluated at Riverside on January 30, 2004, as a condition of bond. It is of note that during the January evaluation, it was suggested Mr. McGhee be evaluated for Major Depressive Disorder, but there was no mention of, or observations of, perceptual disturbances and he was not described as having significant anxiety.

**Criminal History:** As a juvenile, Mr. McGhee was arrested for two curfew violations. He plead guilty to both and paid fines. At age 17, he was convicted of Possession of a Controlled Substance with Intent to Deliver and No Drug Tax Stamp. He plead guilty in June 1995, and was sentenced to three years on probation. However, in 1997, he violated his probation by not reporting to his probation officer, obtaining a urinalysis positive for marijuana, and being terminated from his place of employment due to falsifying his time card. In addition, he also left the state without permission, failed to follow through on recommended substance abuse treatment programming, was convicted of an additional charge, Assault With Injury, and provided a false name and age to law enforcement officers. As a result, the defendant was returned to prison and released on parole on January 4, 1999.

While on parole, he plead guilty to and paid fines accompanying a charge of Criminal Mischief after he damaged two bar stools in a bar. Also while on parole, he was convicted of Aggravated Battery and Driving Under the Influence of Alcohol after he was stopped by a police officer. Mr. McGhee had been operating a motor vehicle while he was intoxicated and possessed crack cocaine. After the police officer stopped him, he attempted to swallow the crack cocaine and caused bodily harm to the officer when he drove the car while the officer was hanging onto the car from the outside. Once the car was stopped and he was arrested, Mr. McGhee was unable to speak or stand due to his severe intoxication. As a result of this conviction, he was sentenced to fines and 24 months of probation. However, he violated his terms of probation by failing to report to his probation officer, failing to report a change of address, and failing to comply with the condition of substance abuse treatment. He was incarcerated for 75 days and his probation was extended to allow him to pay his fines. However, he failed to pay the fines and he was discharged as unsuccessful from probation.

In 2001, Mr. McGhee plead guilty to three different charges of Driving While License Suspended, for each he was sentenced to 30 days in custody. In June 2002, he plead guilty to Improper Turn at an Intersection and Driving While his License was Revoked. He was sentenced to 180 days in custody. In October 2002, he was again charged with Driving While License Revoked.

## EVALUATION FINDINGS
**Behavioral Observations**: Upon his arrival at the institution, the defendant's mood was dysthymic with dull affect. His speech was on-task but slow, with limited spontaneous speech. His immediate recall of three objects was intact but when asked to recall the words

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 5**

after a five minute delay, he was only able to remember one out of three words. His receptive and expressive speech were adequate. Mr. McGhee was able to follow verbal and written multi-step commands. He explained he had experienced some suicidal ideation in the past but he denied any homicidal or suicidal ideation during his intake. He denied any past suicidal attempts or plans. He reported he experienced auditory and visual hallucinations. Specifically, he stated he hears a man's or a woman's voice telling him, "If I go to jail I'm not going to come back, I'm going to get killed. I should hurt myself so no one else has to. Why did I do what I did?" He stated he heard these things everyday. He reported his visual hallucinations occur intermittently and consist of "shadows." He did not report nor display any contraindications for placement in the general population so he was assigned to the pre-trial unit.

Overall, Mr. McGhee arrived promptly and adequately groomed for all evaluation procedures. He navigated the institution without difficulty and did not present any significant management or behavioral problems for institutional staff. While he generally remained in his bed, as the study progressed he was able to attend recreation, look up information in the law library, watch television with other inmates, make regular calls to his family, and have his hair braided weekly. His behavioral controls were appropriate and he did not receive any disciplinary infractions.

Although Mr. McGhee intermittently complained about sleep problems, he also acknowledged he slept during the day. Once he was restarted on an antidepressant, he no longer reported significant problems with sleep and he stated he felt less depressed. He continued to report auditory hallucinations which allegedly occurred "every other day or two." When asked what the voices had told him he stated, "anything." When asked for specific details he recalled how the voices had told him to "drink when he did not want to drink, drive without a license, anything stupid." He added, "If I talked to people about them, they would hurt me."

**Current Mental Status:** Mr. McGhee's general mental status was consistent throughout the course of the study and evaluation period. His mood was dysthymic and anxious, with dull affect. In general, his thoughts were logical and organized. His speech was slow but on-task and relevant to the topic being discussed. While he often hesitated to respond to direct questioning by the examiner, when he was encouraged to ask questions about things he did not understand, he did so on a regular basis. He remained oriented to person, place, and situation. His motor activity was within normal limits with slow gait. He displayed variable eye contact and he did not evidence any facial tics or grimaces. When asked directly, Mr. McGhee continued to report perceptual disturbances but he did not seem overly concerned with these experiences. Aside from the perceptual disturbances, he did not report nor display any thought insertion or broadcasting, delusions, magical powers, or other psychotic phenomena. While he continued to hear voices telling him to hurt himself, he displayed adequate restraint from acting upon them.

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 6**

**Medical Evaluation, Studies and Treatment:** Upon his arrival at FCI Waseca, Mr. McGhee was examined by Health Services staff. His general physical and associated laboratory studies identified no current, significant health problems. Aside from having a tooth pulled in the Dental Clinic, the defendant denied any acute or chronic medical problems and he did not seek out any medical attention. He was prescribed ibuprofen for pain related to his dental work.

**Psychiatric Treatment:** Mr. McGhee arrived to the institution without any prescriptions for psychotropic medications. However, he requested to be placed on the medications he had taken in the Mercer County Jail because they "helped to stop the voices from coming so much." Once records were obtained from the jail, Mr. McGhee was prescribed Prozac and risperidone. However, his compliance with these medications was poor. His reasons for not taking his medications were quite illogical. While he explained he would wake up between 3:30 and 4:00 a.m. and not be able to fall back asleep, he stated he was sleeping through his 6:30 a.m. medications because it was "too early" and he could not get up. Relatedly, the other medication he was prescribed was scheduled for the evening and he stated he did not want to take this medication because it made him too tired too early.

**Psychological Test Results:** Mr. McGhee was administered the Wechsler Abbreviated Scale of Intelligence (WASI). The WASI results in a Full Scale Intelligence Quotient (IQ) similar to the mean and standard deviation of the Wechsler Adult Intelligence Scale - Third Edition (WAIS-III). The results indicated Mr. McGhee's overall intellectual functioning score fell within the Low Average range of ability. There were no clinical differences between his verbal or performance scales or significant strengths or weaknesses which emerged in his profile. These test results are consistent with his use of vocabulary and clinical presentation.

Mr. McGhee was given the Minnesota Multiphasic Personality Inventory - Second Edition (MMPI-2). The MMPI-2 is a structured personality inventory designed to measure an individual's personality characteristics, emotional adjustment, and attitude toward test-taking. The validity indices indicate Mr. McGhee endorsed an extremely high frequency of severe psychological symptoms which were far beyond his clinical presentation or even that reported by individuals experiencing acute and severe psychopathology. This type of response set can be characteristic of individuals exaggerating their psychological difficulties for the purposes of secondary gain or to call attention to their intense subjective distress. In any event, the profile is considered invalid and no further interpretation is warranted.

In attempts to clarify his personality functioning, Mr. McGhee was administered the Million Clinical Multiaxial Inventory - Third Edition (MCMI-III). The MCMI-III is a structured personality inventory geared at examining personality patterns and assisting in the identification of personality disorders. However, similar to his MMPI-2 response pattern, Mr. McGhee's profile suggested he responded to the items in a manner which significantly magnified his current difficulties. Thus, caution is warranted in interpretation of his test

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 7**

results. However, aside from the tendency to magnify illness, complain, or exaggerate, there were several elevations which suggested Mr. McGhee lacks strong coping skills, sees himself as weak and socially ineffective, and is chronically prone to dysthymia and anxiety. Further, it is highly likely that in part, his use of substances is an attempt to lessen his feelings of inadequacy and inhibitions around other people. Interpersonally, he is conflicted because while he is suspicious of others and their motives, he is quite dependent on other people.

Due to the increasing evidence he could be fabricating or exaggerating at least some of his symptoms, Mr. McGhee was administered the Structured Interview of Reported Symptoms (SIRS). The SIRS was developed to systematically assess deliberate distortions in the self-report of symptoms (i.e., malingering). The results of the SIRS reveal Mr. McGhee had elevated scores in several areas. According to the SIRS Professional Manual, the number of elevations in Mr. Mc Ghee's profile results in a 100% likelihood he is feigning symptoms, with no possibility of honest responding. These results are consistent with other test data, Mr. Mc Ghee's clinical presentation, and his social interactions on the telephone.

**DIAGNOSTIC IMPRESSION:** Prior to his detainment for the current offense, Mr. Mc Ghee was diagnosed with Alcohol and Cannabis Dependence. According to the <u>Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition - Text Revision (DSM-IV-TR)</u> substance dependence is characterized by compulsive drug use with associated problems in the areas of vocational, interpersonal, and social functioning. It is clear that in the past, the defendant used alcohol and marijuana in a manner which resulted in social, relationship, and legal problems. Mr. McGhee's description of his frequency and quantity of use is suggestive of Alcohol and Cannabis Dependence. Mr. McGhee reported he continued to use marijuana and alcohol up until his arrest for the alleged offense. This was confirmed by his wife. Additionally, given the defendant is currently being detained, it is also appropriate to clarify his current status as, In a Controlled Environment.

Past data suggests the defendant has been diagnosed with a mood disorder, specifically, Bipolar Disorder. However, there is no evidence from clinical interviews with the defendant, interviews with his wife or any evidence from past clinical records that the defendant has ever experienced a manic or hypomanic episode, required for a diagnosis of Bipolar Disorder. After his arrest for the current offense, while participating in drug abuse treatment services, it was recommended Mr. McGhee be referred for an evaluation for Major Depression.

During the current evaluation, the defendant was assessed for a depressive episode. A Major Depressive Episode is defined by <u>DSM-IV-TR</u> as a period of at least two weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities accompanied by appetite and sleep disturbance, feelings of worthlessness or inappropriate guilt and diminished ability to concentrate or think. Depressive ideation and hopelessness are also common reactions to alcohol use and subsequent withdrawal,

especially in individuals predisposed to negative mood states, such as the defendant. The defendant did report some depressive ideation and appeared to experience some difficulty in his ability to concentrate and engage in spontaneous conversation during clinical interviews. However, monitoring of his phone calls indicated he remained on-task, displayed a wide range of mood states and flexible affect, demonstrated interest in his family, displayed future-orientation, and demonstrated an ability to discuss his case, though this was infrequent and cryptic due to his awareness his phone calls were monitored. This suggests his depressed mood state is situationally related to his current legal proceedings and not a pervasive pattern in his current overall functioning.

Both the defendant and his wife expressed concerns about his problems with "anxiety." Specifically, both reported the defendant experiences "panic attacks." Reportedly these attacks involve trouble breathing, hyperactivity, and dry heaving. Mr. McGhee stated these "attacks" occur "a couple times a month" and last for "about a minute or two." Apparently these experiences began around the time of the instant offense. He stated he had experienced a few panic attacks during the course of his evaluation, but he failed to report these experiences to any correctional staff and only mentioned them to this evaluator in passing. While breathing difficulties and nausea can certainly be symptoms of panic attacks, given the defendant's pattern of symptom exaggeration during the course of his study and the lack of strong collateral evidence, additional assessment of the defendant's report is warranted before his panic attacks are diagnosed. At this time, it is clear the defendant feels overwhelmed by his current legal situation and he worries about it a great deal. He feels ill-informed and pushed through the legal system, which only heightens his sense of inferiority, lack of control, and anxiety.

Thus, while Mr. McGhee reports and displays depressive and anxious symptoms related to his current legal situation, there is little-to-no evidence he experienced significant symptoms prior to his arrest for the current charge. He has complained of symptoms only since his arrest. Such a presentation is consistent with an Adjustment Disorder with Mixed Anxiety and Depressed Mood. According to the DSM-IV-TR, the essential feature of this disorder is a psychological response to an identifiable stressor which results in the development of clinically significant emotional or behavioral symptoms.

Finally, although the defendant reported hallucinations which have allegedly occurred "constantly" since he was 18 or 19 years of age, his clinical course and presentation are not consistent with his report. While it is true psychotic disorders most commonly emerge during late adolescence or early adulthood, especially when faced with stress such as incarceration, there is no objective evidence to support the defendant's claim he began to experience these symptoms at that age. Additionally, while certainly the defendant did appear to be less than engaged or distracted during many of his clinical interviews, these features are also present with depression, anxiety, and simply not understanding the material being presented. Further, aside from his report of hallucinations, he did not report

nor display any thought insertion / broadcasting, delusions, magical powers or other psychotic phenomena. He was also rather inconsistent in his past reporting of these experiences. While he told the clinical staff at Trinity Medical Center, after he had been arrested, he had been experiencing hallucinations for nine years, there is no mention of these symptoms in any of the rest of his available treatment records. Given these inconsistencies and his psychological test data, it is quite probable that Mr. McGhee is fabricating his report of auditory hallucinations. The essential feature of Malingering, as defined by the DSM-IV-TR, is the intentional production of false or grossly exaggerated psychological symptoms, motivated by external incentives such as evading criminal prosecution, obtaining disability payments, or avoiding employment or other financial obligations. Based on the available information, Mr. McGhee is clearly engaging in such behavior.

The following diagnoses are offered in accordance with the criteria set forth in the DSM-IV-TR.

| | | | |
|---|---|---|---|
| **Axis I:** | 309.28 | | Adjustment Disorder with Mixed Anxiety and Depressed Mood |
| | 304.30 | | Cannabis Dependence, with Physiological Dependence, in a Controlled Environment |
| | 303.90 | | Alcohol Dependence, With Physiological Dependence, In a Controlled Environment |
| | V65.2 | | Malingering |
| **Axis II:** | V71.09 | | No diagnosis |
| **Axis III:** | | | None |

**PROGNOSIS:** Despite his anxiety and depressive ideation, Mr. McGhee is currently clinically stable at this time. It is likely he will continue to benefit from an antidepressant, so this medication should be continued and monitored on a regular basis. The defendant lacks effective coping skills so he may also require additional supportive services as he continues to proceed with his legal case. While this may come in the form of mental health services, much of his current anxiety is related to his poor relationship with his attorney. Mr. McGhee struggles with many of the concepts, verbiage, and legal nuances of his case. However, he was able to learn from discussions about his case during the current study and evaluation. As such, he would benefit from additional interactive and educational sessions relating to his case. It is also recommended Mr. McGhee participate in intensive substance abuse treatment programming in a residential or secure setting due to the failure of his past outpatient efforts. Given his repeated history of substance abuse despite the legal consequences, his prognosis is guarded at this time.

**OPINION ON COMPETENCY TO PROCEED:** On January 21, 2004, the defendant was

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 10**

indicted for Distribution of Five Grams or More of Cocaine Base (Crack) on August 5, 2003. On May 14, 2004, the defendant plead guilty to the Indictment pursuant to a written Plea Agreement. A Presentece Investigation Report was completed on July 27, 2004, with a sentencing hearing set for February 11, 2005. On January 26, 2004, Mr. McGhee was released on an unsecured bond with special conditions. However, the defendant failed to follow these conditions, specifically, failing to submit to a drug test, violating the rules of home confinement, receiving a new charge of Driving While License Revoked, and consuming alcohol. As a result, on June 18, 2004, his bond was revoked and he was returned to the custody of the United States Marshals Service. The context for the current evaluation is related to the defendant's ability to comprehend his plea agreement and competency to move ahead with sentencing.

In order to assist in the evaluation of Mr. McGhee's competence to proceed, he was administered the revised Competency Assessment Instrument (CAI). The CAI is a 14-part semi-structured interview, designed to assess an individual's ability to articulate understanding of the nature and consequences of criminal charges and court proceedings, and the ability to assist counsel in a defense. Overall, Mr. McGhee displayed a functional understanding of the case against him and, when describing the alleged offense, he recalled the major elements accurately. He correctly identified his current charge as a felony and understood what actual behaviors comprised the offense. Mr. McGhee was open in discussing his case and displayed a good understanding and recall of the investigation process and why the charge had been brought against him. He displayed a basic understanding of the criminal adjudication process.

When asked about possible penalties if found to be guilty of the current charge, he stated, "I guess what I plead to, ten years." The defendant displayed an understanding of probation and cited several possible conditions of probation including drug testing, abstinence from drugs and alcohol, having to report in with a probation officer, being prohibited from owning a firearm, and having to maintain employment. He provided examples of conditions from when he was on parole and probation before and also acknowledged penalties for parole violations. He acknowledged if he was convicted, which he thought was likely, he would serve time in federal prison.

Mr. McGhee easily identified the various pleas and explained the consequences of each, with the exception of the not guilty by reason of insanity plea. However, once this plea was explained to him, he thought maybe this is the plea he should have entered. When asked about the ramifications of an insanity plea he stated he would "go to a hospital." The more this plea option was discussed, the more the defendant began to make statements about hearing voices or not "being in [his] right mind" at the time of the alleged offense.

There was considerable discussion between the defendant and this writer regarding his plea agreement. While he understood the process of a plea agreement as "a paper where you plead guilty to a certain amount of time to keep from going to trial. It saves time, money and

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 11**

you get lesser time." However, he was adamant he did not want to plead guilty because he "did not do the things they said [he] did." He admitted he was there but he didn't sell drugs. Mr. McGhee reported he would plead guilty to Aiding and Abetting because he was present at the time of the drug sale interaction. When asked about the plea agreement to which he had stipulated, he said he had "no idea" what he had signed, that "[he] just signed it because [his] lawyer told him to." Further, he stated his attorney told him if he did not sign the plea agreement, the prosecution would bring another charge, Conspiracy, against him. At this point, the "Cooperation Plea Agreement and Stipulation of Facts" was reviewed extensively with the defendant. The following are points to which the defendant stated he was unaware:

> 1) Page 2, paragraph 3, He did not know the Court had the option to not accept the recommendations of the parties in the plea agreement and if the Court chose this option, Mr. McGhee could not withdraw his plea of guilty.
>
> 2) Page 4, paragraph 10, He stated he was unaware he was knowingly and voluntarily waiving the right to appeal any and all issues relating to the plea agreement and conviction and to the sentence, including fines, restitution, within the maximum provided in the statutes of conviction, and the manner in which the sentence, including any fine or restitution was determined on any ground whatever, in exchange for the concessions made by the United States in this plea agreement, unless otherwise stated in this paragraph.
>
> 3) Page 4, paragraph 11, Mr. McGhee denied having the opportunity to thoroughly discuss his rights regarding collateral attack on the conviction or sentence, with his attorney.
>
> 4) Page 5, paragraph 13, The defendant stated his attorney did not review and he did not understand the possible application of United States Sentencing Guidelines Section 5H.1 through 5H1.12, Section 5K.2.0 through Section 5K2.21.
>
> 5) Page 11, paragraph 24b, Mr. McGhee argued that during the discovery phase, he was told the confidential informant did not have a body recorder on him but the plea agreement stipulates he did.

Overall, while the defendant was confused about some of the language and stipulations, with discussion and education, he was able to learn and comprehend the material in the agreement. As far as his reports that this information was not discussed with him by his attorney thoroughly, this is only based on his self-report. It does appear he was lacking a good deal of understanding about the nature of the plea agreement, though some of the information was simply information with which he did not agree. At the conclusion of this portion of the evaluation, he stated he would have preferred to go to trial had he understood the nature of the plea agreement. His failure to understand this information may have been

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 12**

impacted by his depressive or anxious ideation, but more likely, it is related to his overall personality and intellectual functioning. Specifically, he displays poor assertiveness and discomfort in asking questions when he does not understand. However, it is doubtful he actually lacks the capacity to work meaningfully on his defense, as evidenced by his work in the law library and discussions with his wife after his case was discussed during interviews.

Mr. McGhee correctly identified the roles of various courtroom participants. He articulated an understanding of appropriate courtroom behavior and procedures, such as only speaking out in the courtroom when asked by court personnel, and behaving in a calm and orderly manner. He stated if he was confronted by someone lying about him in court, or not understanding something said in court, he would address these issues quietly with his attorney. Mr. McGhee defined the concepts of evidence and witnesses and identified examples of each, related to his case. When asked about the government's case against him, he explained, "They just have another person saying that I sold drugs."

Regarding working with his defense counsel, he identified his attorney and denied any confidence in his defense counsel explaining, "He left me in a room of detectives, he was not in there. He showed up late to Court, he did not defend me, he did not do the things I asked him to do." His wife confirmed the defendant's perception of counsel stating:

> The attorney walked out and left him in the room to be interrogated. He told him to sign some papers so he could go home. Basically, these papers said he would cooperate when agents wanted to interrogate further. He did things on his own, not with others.

She was of the opinion the defendant did not understand the plea agreement even though it was read to him in Court. Mr. McGhee understood he can ask the Court to appoint another attorney or he can hire new counsel but admitted he was reluctant to do so because his wife had already paid his current counsel so much. Although current counsel was not available to explain his perspective of the attorney-client relationship, it is clear the defendant can cooperate with his counsel in a meaningful way, should he choose to do so.

Overall, the defendant understands basic court procedures and concepts. Despite his current depressed and anxious mood, Mr. McGhee appears able to understand the nature and consequences of the proceedings against him and to assist properly in his own defense. Further, while he remains confused and in disagreement about some aspects of his plea agreement, he is able to rationally challenge these aspects and has actively worked on obtaining information to assist his counsel during the current study and evaluation period.

**ACCOUNT OF THE ALLEGED OFFENSE FROM COLLATERAL SOURCES:** On August 5, 2003, members of the Quad Cities Federal Gang Task Force (QCFGTF) utilized a confidential source (CS) to purchase crack cocaine from the defendant. While he was under constant surveillance, Mr. McGhee was observed to distribute 10.8 grams of crack

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 13**

cocaine to the CS in the area of 9th Street and 18th Avenue in Rock Island, Illinois. On September 23, 2003, members of the Moline, Illinois, Police Department Street Crimes Unit utilized another CS to purchase crack cocaine from Mr. McGhee. He was observed to distribute 1.4 grams of crack cocaine to the CS at a Motel 6 in Moline. After this transaction, the defendant was arrested and he made a post-arrest statement and admitted his involvement in the September 23, 2003, drug transaction. Between these two incidents, the defendant is charged with distributing a total of 12.2 grams of crack cocaine.

In reviewing the actual behavior comprising the offense, Mr. McGhee returned the call of the CS, who had called him several times and requested to purchase crack cocaine from the defendant. During that call, at 4:38 p.m. on August 5, 2003, Mr. McGhee told the CS he would be ready in 10 to 15 minutes. At 5:45 p.m., Mr. McGhee called the CS to come to his residence. After entering the residence, the CS observed another individual sitting on the kitchen floor and the defendant sitting at the bottom of the stairs. Apparently, the CS was initially given a purported amount of one half ounce of crack cocaine, but the CS knew the amount was too small. When the CS confronted the defendant about this, Mr. McGhee reportedly put his finger up to his lips to quiet the individual. Then Mr. McGhee offered the CS an extra one half gram of purported crack cocaine for which he requested the entire $450.00. Mr. McGhee then put the contents of the extra one half gram into the original one half ounce baggie.

**ACCOUNT OF THE ALLEGED OFFENSE FROM THE DEFENDANT:** Mr. McGhee stated he recalled the numerous phone calls made to his phone on the date of August 5, 2003. He stated he knew it "was the guy who bought the drugs." He explained, "I wasn't selling drugs, so I didn't take the call." However, he acknowledged he finally did take the call and he told the CS to "meet [him] in 10 to15 minutes." He stated he only took the call because he "wanted him to quit calling." Mr. McGhee returned home from the liquor store and when he arrived he saw his associate and the intended buyer. He recalled all three of them went inside the house and "[He] was hearing voices so [he] went down into the basement for five minutes." He stated while he was in the basement, the "voices" were "trying to get [him]," and they "told [him] to hurt himself] while he was down there." When he came back up, his associate and the CS were talking. Mr. McGhee stated although the CS reported Mr. McGhee had told him to be quiet, during this evaluation he stated he wasn't talking to him, but was talking to the "voices." Mr. McGhee stated he then went to the bathroom and when he returned, his associate had a scale. He said this associate asked him to pass the cocaine to the buyer so he did so, although he maintained he did not know what it was until he looked at it. He added he was not going to pass it but he heard voices telling him to "pass it or else," but on another occasion he stated the voices told him "it is okay to pass it to him." He remembered the CS counting out the money and then leaving. Shortly thereafter, his associate left as well.

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 14**

Mr. McGhee's wife recalled during the month of August 2003, the defendant was "very paranoid." She stated he was "jumpy, on the edge, and nervous." She stated he was like this even when he was not intoxicated with marijuana or alcohol. Mr. McGhee recalls he used marijuana and alcohol nearly every day until his arrest in September 2003.

**OPINION REGARDING SANITY AT THE TIME OF THE ALLEGED OFFENSE:** Although the defendant reports he was experiencing auditory hallucinations at the time of the alleged offense, this is highly questionable given his description of the content and process of the reported voices. This is especially suspect since his behavior during the current evaluation suggests he is malingering some of his mental health symptoms. Further, even if he was hearing voices, he admitted he clearly understood selling drugs was illegal and he knew he was, in the least, in the middle of a drug sale transaction. While he tried to remove himself from criminal responsibility by stating he did not know it was illegal to "pass" the drugs as long as "[he] wasn't selling them," this is highly improbable. When he was asked about this, he maintained the voices threatened him, stating he had to pass the drugs, but he did not want to. However, when asked why the voices would have to "make him do it," if it was not illegal, he did not respond. While he reported he only passed a bag to the purchasing individual, the investigative reports clearly indicate he was involved with the measurement of the cocaine as well, which he denied. Mr. McGhee stated he only took the phone call because he knew if he did not, the CS would continue to call. When asked why he did not tell the caller he was not going to sell him drugs, he was unable to provide a response.

It is most likely that the "paranoia" and nervousness reported by the defendant's wife was related to his criminal activities rather than any clinical condition or his ongoing substance use. There is no significant, objective evidence the defendant's mental state was compromised during the alleged offense to the extent he could not appreciate the nature, quality, and wrongfulness of his actions.

| | | |
|---|---|---|
| _(signature)_ | Shelia M. Brandt, Psy.D. | Forensic Psychologist |
| Signature | Printed name | Title of Primary Evaluator |

**MCGHEE, REVERE LAMAR**
**REG. NO.: 13267-026**
**DOB: 06-03-1977**
**FCI WASECA**
**PAGE 15**



**CHAMBERS OF**
**MICHAEL M. MIHM**
U.S. DISTRICT JUDGE

# United States District Court
Central District of Illinois

204 U.S. COURTHOUSE
100 N.E. MONROE STREET
PEORIA, ILLINOIS 61602
TELEPHONE: (309) 671-7113
FACSIMILE: (309) 671-7375
E-MAIL:
MICHAEL_MIHM@ILCD.USCOURTS.GOV

## FACSIMILE TRANSMISSION

DATE:      May 26, 2005

FROM:      Michael M. Mihm
           U.S. District Judge
           Central District of Illinois

           Phone: (309) 671-7113
           Fax:   (309) 671-7375

TO:        Atty. Jack Schwartz
           (309) 793-9026

           AUSA Sara Darrow
           (309) 793-5895

NUMBER OF PAGES (including cover page): 16

REMARKS: Attached please find the Forensic Evaluation Report on Revere McGhee, Case No. 04-40006, that we received from the Bureau of Prisons this morning.